[No. 73005-9.   En Banc.]
Argued June 12, 2003.      Decided September 9, 2004.

THE CITY OF SEATTLE, *Petitioner*, v. MIGHTY MOVERS, INC.,
*Respondent*.

*Thomas A. Carr, City Attorney*, and *Gary E. Keese* and *Thomas M.A. Castagna, Assistants*, for petitioner.

*Chase C. Alvord* (of *Tousley Brain Stephens, P.L.L.C.*), for respondent.

*Allen B. Draher, Paul J. Lawrence*, and *Robert J. Dzielak* on behalf of American Civil Liberties Union and Joint Artists & Music Promotions, Inc., amici curiae.

*Richard H. Robblee, Kristina M. Detwiler*, and *Jacob H. Black* on behalf of International Brotherhood of Electrical Workers, Local No. 77, amicus curiae.

MADSEN, J. — Under a city ordinance prohibiting the posting of signs on city property, the city of Seattle (City) billed Mighty Movers, Inc., for the costs of removing signs it had posted on utility poles. When Mighty Movers refused to pay the costs, the City filed this action to recover them. Mighty Movers challenged the constitutionality of the ordinance under article I, section 5 of the Washington State Constitution. The trial court upheld the constitutionality of the ordinance on the basis that a utility pole is a nonpublic forum, the ordinance is reasonable in light of the purposes of utility poles, and the ordinance is content and viewpoint neutral. The Court of Appeals reversed, concluding that the utility poles adjacent to the City's streets and sidewalks

constitute a traditional public forum and, under the state constitutional standard applicable to public forums and overbreadth principles, the ordinance is unconstitutional. We hold that utility poles are a nonpublic forum and the ordinance constitutionally prohibited posting on city utility poles. Accordingly, we reverse the Court of Appeals' decision.

## Facts

In 1994, the City enacted Ordinance 117066, codified at former Seattle Municipal Code (SMC) 15.48.100 through SMC 15.48.130, making it unlawful for anyone to affix any handbill, sign, or poster to any traffic control device, utility pole, lamppost, city-owned structure, or city-owned tree or shrub in a public place.[1] The City made legislative findings that, among other things, the primary purpose of utility poles is to support utility lines; there had been a recent and pronounced proliferation of handbills, signs, and posters attached to utility poles; the Seattle Fire Department had reported a growing number of incidents where accumulated posted materials had been set on fire; the proliferation of the material represented a safety hazard to utility workers climbing the poles to perform essential duties; the material substantially contributed to visual blight and clutter and harmed the urban aesthetic; and utility poles have traditionally served a limited secondary purpose of providing for the placement of traffic, parking, and similar regulatory signs posted by the government.

The ordinance provided for enforcement through provisions authorizing the recovery of the costs of removal of

---

[1] Former SMC 15.48.100 provided:

It is unlawful for anyone to affix any handbill, sign, or poster upon any traffic control device, utility pole, lamp post, City-owned structure, or City-owned tree or shrubbery in any public place, or to affix the same to a wire or appurtenance thereof, except that affixation is authorized on poster boards and kiosks that are designated for handbills and signs. The provisions of this section shall not apply to traffic, parking and other regulatory signs posted under the auspices of a public agency with the permission of the City.

City-owned structures include bridges and overpasses, monorail supports, retaining walls, fences, street furniture and shelters, among other construction.

illegal postings. SMC 15.48.120; *see* SMC 15.48.130 (containing rebuttable presumptions concerning who would be responsible for costs of removal). Following enactment of the ordinance, the City removed unlawfully posted materials and sent invoices to groups, organizations, and individuals presumed responsible for unlawful postings. During the period from December 1998 through October 1999, the City removed 149 brightly colored Mighty Movers advertising signs, nearly all posted on utility poles throughout the city, and sent an invoice to Mighty Movers for costs of removal. Mighty Movers refused to pay.

The City filed suit in Seattle Municipal Court to collect the costs of removing the Mighty Movers signs, plus prejudgment interest and attorney fees. Mighty Movers filed a counterclaim seeking a declaration that the ordinance is unconstitutional on its face under article I, section 5 of the Washington State Constitution. The action was removed to superior court by stipulation. In October 2000, the parties filed cross-motions for summary judgment. The trial court granted the City's motion, reasoning that utility poles are not a traditional public forum, and the ordinance is reasonable and content and viewpoint neutral. The trial court entered judgment in favor of the City and awarded the City reasonable attorney fees.[2] The Court of Appeals reversed, holding that the City's utility poles located on or adjacent to a street or sidewalk within the City are a traditional public forum, and the ordinance was not narrowly tailored to serve a compelling governmental interest, nor were adequate alternative means of communication available. The court then held the provisions of the ordinance restricting posting on poles (utility poles, lampposts and traffic control devices) overbroad because they swept within their prohibitions

---

[2] Mighty Movers stipulated that "[u]nless Seattle Municipal Code Sections 15.48.100-.130 are determined to be unconstitutional, Defendant Mighty Movers, Inc. is responsible to pay Plaintiff The City of Seattle $7,870.00 plus interest at the rate of 12% per annum, reasonable attorney's fees, and legal costs as requested by the Amended Complaint for Monies Due filed by Plaintiff The City of Seattle in this matter." Clerk's Papers at 857-58.

constitutionally protected speech. The Court of Appeals concluded that the trial court erred in failing to grant Mighty Movers motion for summary judgment. *City of Seattle v. Mighty Movers, Inc.*, 112 Wn. App. 904, 51 P.3d 152 (2002), *review granted*, 148 Wn.2d 1020 (2003).[3]

## Analysis

■ We review a grant of summary judgment de novo, applying the same standard as the trial court. *Stalter v. State*, 151 Wn.2d 148, 155, 86 P.3d 1159 (2004); *Clawson v. Grays Harbor Coll. Dist. No. 2*, 148 Wn.2d 528, 536, 61 P.3d 1130 (2003). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." CR 56(c). Here, the facts are undisputed, and we decide whether as a matter of law summary judgment was properly granted. *Clawson*, 148 Wn.2d at 536-37.

■ Mighty Movers contends that the City's ordinance violates article I, section 5 of the Washington State Constitution, which provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." The controlling issue is whether city utility poles constitute a public forum to which citizens have traditionally had a right of access for communication. Because our jurisprudence in this context draws substantially on federal law, we begin our discussion with the origins of the public forum analysis.

---

[3] Following the Court of Appeals' decision, the City of Seattle adopted Ordinance 121038, repealing former SMC 15.48.100 and adding SMC 15.48.105 to provide, among other things, new restrictions for posting on utility poles, lampposts, and traffic control devices. Ordinance 121038 was expressly adopted to respond to the Court of Appeals' opinion in this case. It specifically notes the petition for review filed in this court and states the City's intent to provide time, place, and manner regulations for posting on utility poles, lampposts, and traffic control devices "for so long as they are deemed to be a traditional public forum by the court." Ordinance 121038 (Dec. 16, 2002). The City expressly disavowed any intent to create a dedicated public forum. *Id.*

The First Amendment, as initially interpreted, did not establish any right of access to public property as a forum for speech. *See* Patricia Klein Smoots, Note, Members of the City Council v. Taxpayers for Vincent: *The Constitutionality of Prohibiting Temporary Sign Posting on Public Property to Advance Local Aesthetic Concerns*, 34 DePaul L. Rev. 197 (1984). To the contrary, in *Davis v. Massachusetts*, 167 U.S. 43, 17 S. Ct. 731, 42 L. Ed. 71 (1897), the Supreme Court emphatically rejected any right of access. The Court equated the state's position to that of a private property owner, with as much authority to prohibit communicative activity on state property. *Id.* Forty years later, however, a plurality of the Court announced a public right of access to streets and parks in *Hague v. Committee for Industrial Organization*, 307 U.S. 496, 59 S. Ct. 954, 83 L. Ed. 1423 (1939). There the Court recognized that use of certain public property has "from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." *Id.* at 515. The *Hague* plurality recognized that while a citizen's right of access to the streets and parks is not absolute, it must not be abridged or denied in the guise of regulation. *Id.* at 516.

To assess whether public property constitutes a public forum, the United States Supreme Court applies a forum analysis that identifies three categories of public property and two tiers of judicial scrutiny. The three categories of public property are (1) public property that has traditionally been made available as a part of the "privileges, immunities, rights, and liberties of citizens"; (2) public property that has been designated by the government as a public forum; and (3) all other public property. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983); *see Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 112 S. Ct. 2701, 120 L. Ed. 2d 541 (1992); *Frisby v. Schultz*, 487 U.S. 474, 479-80, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988). The third category of property constitutes nonpublic forums. The level of judicial scrutiny to which a challenged regulation

will be subject and the degree of judicial deference that will be afforded the legislative balance struck in the regulation is determined by the category into which a specific type of property falls. *See Perry Educ. Ass'n*, 460 U.S. at 44; *City of Seattle v. Huff*, 111 Wn.2d 923, 926, 767 P.2d 572 (1989). Therefore, an analysis of the "character of the property at issue" is the touchstone of a legal inquiry into the constitutional validity of a regulation that attempts to limit expressive activity. *Perry Educ. Ass'n*, 460 U.S. at 44.

Under the First Amendment, speech in a public forum, whether a traditional public forum or a public forum by government designation, is subject to restrictions on "time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n*, 460 U.S. at 45; *see Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989); *Frisby*, 487 U.S. at 481; *United States v. Grace*, 461 U.S. 171, 177, 103 S. Ct. 1702, 75 L. Ed. 2d 736 (1983).[4] However, we have held that under the broad language of article I, section 5, restrictions on speech in a public forum can be imposed only on a showing of a compelling governmental interest. *Collier v. City of Tacoma*, 121 Wn.2d 737, 747-48, 854 P.2d 1046 (1993) (citing *Bering v. Share*, 106 Wn.2d 212, 234, 721 P.2d 918 (1986)). We apply the same standard, however, under

---

[4] The Court has not been consistent in its statement of the standard applicable to public forums. It has sometimes stated that a speaker may be excluded from a traditional public forum " 'only when the exclusion is necessary to serve a *compelling* state interest and the exclusion is narrowly drawn to achieve that interest.' " *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677, 118 S. Ct. 1633, 140 L. Ed. 2d 875 (1998) (emphasis added) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985)). This formulation appears to have its source in *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983). *E.g.*, *Cornelius*, 473 U.S. at 800 (citing *Perry Educ. Ass'n*, 460 U.S. at 45). However, *Perry* uses the term "compelling" when referring to content-based restrictions. *See Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761 (opinion of Scalia, J., Rehnquist, C.J., Kennedy and Thomas, JJ., Part II), 772 (O'Connor, J., concurring in Part II), 115 S. Ct. 2440, 132 L. Ed. 2d 650 (1995) (citing *Perry Educ. Ass'n*, 460 U.S. at 45) (a state "may regulate expressive *content* only if such a restriction is necessary, and narrowly drawn, to serve a compelling state interest") (emphasis added).

article I, section 5 for speech in a nonpublic forum as is applied under the First Amendment. "Speech in nonpublic forums may be restricted if ' " . . . the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." ' " *Huff*, 111 Wn.2d at 926, 928 (quoting *City of Seattle v. Eze*, 111 Wn.2d 22, 32, 759 P.2d 366 (1988) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985))).

There is no claim here, and no evidence in the record, that the government has designated utility poles as a public forum. The question is whether the City's utility poles constitute a traditional public forum. As first stated by the plurality in *Hague*, heightened protection is afforded to the use of property that has

> immemorially been held in trust for the use of the public and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. [Use of such] places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

*Hague*, 307 U.S. at 515. This understanding of what constitutes a public forum has since been approved by a majority of the Court. *E.g.*, *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 813, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984). The Court has expressly "rejected the view that traditional public forum status extends beyond its historic confines." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678, 118 S. Ct. 1633, 140 L. Ed. 2d 875 (1998). The Court has provided additional guidance for determining what constitutes a traditional public forum, observing that "a traditional public forum is property that has as 'a principal purpose . . . the free exchange of ideas.' " *Krishna*, 505 U.S. at 679 (quoting *Cornelius*, 473 U.S. at 800).

Traditional public forum property occupies a special position in court jurisprudence, as well as this state's case law. Although this court has recognized that the free speech clauses of the state and federal constitutions are different

in wording and effect, we have adopted the federal analysis to determine whether a particular class of public property is a traditional public forum under our state constitution. *See, e.g., Huff,* 111 Wn.2d at 928; *Bering,* 106 Wn.2d at 234; *Collier,* 121 Wn.2d 737; *cf. Southcenter Joint Venture v. Nat'l Democratic Policy Comm.,* 113 Wn.2d 413, 431-32, 780 P.2d 1282 (1989) (noting the "United States Supreme Court expressly declined to extend the 'public function' doctrine to a privately owned shopping mall" and finding no "persuasive reason why this doctrine should apply any differently under our state constitution").[5]

Thus, without performing an independent forum analysis in *Bering,* we cited *Grace,* 461 U.S. at 177, and *Perry Education Association,* for the proposition that streets and sidewalks are "public forums." *Bering,* 106 Wn.2d at 221-22. In *Collier,* 121 Wn.2d at 746, we noted that federal cases do not compel a result under the state constitution, but nevertheless did not perform an independent analysis to conclude that the area between streets and sidewalks is a public forum but instead cited United States Supreme Court decisions for that proposition.[6]

As with the property at issue in *Bering* and *Collier,* the United States Supreme Court has analyzed whether utility poles are a traditional public forum and has concluded that

---

[5] No *Gunwall* analysis (*State v. Gunwall,* 106 Wn.2d 54, 720 P.2d 808 (1986)) is necessary in this case because we have already determined the appropriate state constitutional analysis under article I, section 5 in this context. *See State v. White,* 135 Wn.2d 761, 769, 958 P.2d 982 (1998).

[6] *City of Seattle v. Huff,* 111 Wn.2d 923, 928, 767 P.2d 572 (1989) is not to the contrary. In *Huff,* we performed a forum analysis, applying the federal analysis to decide a challenge to a Seattle city ordinance criminalizing telephone harassment brought under the First Amendment and article I, section 5 of the Washington State Constitution. *Id.* at 926-27. When *Huff* was decided, the United States Supreme Court had not yet considered whether telephones were a public or nonpublic forum. Thus, we did not have the benefit of a court case addressing whether the particular class of property was a traditional public forum, as it did in *Bering v. Share,* 106 Wn.2d 212, 721 P.2d 918 (1986) and *Collier v. City of Tacoma,* 121 Wn.2d 737, 854 P.2d 1046 (1993). Therefore, the key inquiry for the court was whether a traditional right of access to telephones existed comparable to that recognized for public streets and parks. When we applied the federal forum test to the *Huff* facts, we determined that telephones are a nonpublic forum. *Huff,* 111 Wn.2d at 927.

they are not. *Vincent*, 466 U.S. 789. At issue in *Vincent* was a Los Angeles Municipal Code provision prohibiting the posting of signs on public property.[7] The Taxpayers for Vincent (Taxpayers), a group of supporters of a candidate for election to the Los Angeles City Council, contracted with a graphics service to design, fabricate, and post campaign signs on utility poles and crosswires throughout the city. Pursuant to the city ordinance, city employees removed the signs. Taxpayers filed suit against the city of Los Angeles, alleging that the ordinance abridged its freedom of speech under the First Amendment. The federal district court granted summary judgment for the city. The Ninth Circuit reversed on overbreadth grounds, holding that the city had not justified its total ban on all signs on the basis of its asserted interests in preventing visual clutter, minimizing traffic hazards, and preventing interference with the intended use of public property. The United States Supreme Court reversed the appeals court.

First, the Court held that an overbreadth challenge was inappropriate. The Court noted that the facial overbreadth doctrine represents an exception to the general rule that a litigant has standing only to vindicate his own constitutional rights. *Vincent*, 466 U.S. at 798. As the doctrine developed, however, the Court recognized that the overbreadth doctrine itself "might sweep so broadly that the exception to ordinary standing requirements would swallow the general rule." *Id.* at 799. In the case of the Los Angeles ordinance, the Court held, Taxpayers failed to identify any "significant difference between their claim that the ordinance is invalid on overbreadth grounds and their claim that it is unconstitutional when applied to their

---

[7] The ordinance is very similar to Seattle's ordinance:

"No person shall paint, mark or write on, or post or otherwise affix, any hand-bill or sign to or upon any sidewalk, crosswalk, curb, curbstone, street lamp post, hydrant, tree, shrub, tree stake or guard, railroad trestle, electric light or power or telephone or telegraph or trolley wire pole, or wire appurtenance thereof or upon any fixture of the fire alarm or police telegraph system or upon any lighting system, public bridge, drinking fountain, life buoy, life preserver, life boat or other life saving equipment, street sign or traffic sign."

*Vincent*, 466 U.S. at 791 n.1 (quoting L.A. Mun. Code § 28.04).

political signs." *Id.* at 802. Taxpayers did not show that the ordinance applied to "any conduct more likely to be protected by the First Amendment than their own crosswire signs." *Id.* Accordingly, the Court declined to conduct an overbreadth analysis. The Court also observed that because Taxpayers conceded that the ordinance served its safety purpose in some of its applications, the ordinance was not subject to the claim that it was facially invalid in all of its applications. *Id.* The Court therefore limited its analysis to the facts before it, i.e., whether, as applied to the expressive activity of the Taxpayers, the ordinance violated the First Amendment. *Id.* at 802.

Turning to Taxpayers' individual challenge, the Court began its analysis with the recognition that Los Angeles' ordinance is viewpoint neutral. The Court found this point significant because its cases have long recognized that the state may legitimately exercise its police powers to advance aesthetic values through viewpoint neutral laws. *Id.* at 808. The critical inquiry in a challenge to such laws is "whether that interest is sufficiently substantial to justify the effect of the ordinance on [Taxpayers'] expression, and whether that effect is no greater than necessary to accomplish the City's purpose." *Id.* at 805. Reviewing its cases, the Court concluded that cities have a "weighty" interest in "proscribing intrusive and unpleasant formats for expression." *Id.* at 806. In particular, the Court explicitly reaffirmed its decision in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 101 S. Ct. 2882, 69 L. Ed. 2d 800 (1981) that visual clutter on public property "constitutes a significant substantive evil within the [government's] power to prohibit." *Vincent*, 466 U.S. at 807.

Next, the Court considered whether the scope of the ordinance was broader than necessary to protect the city's interest. It found that the restrictions imposed by the ordinance represented a reasonable regulation of time, place, and manner, narrowly tailored to serve the city's interest. First, the Court observed that the law did no more than eliminate "the exact source of the evil it sought to

remedy." *Id.* at 808. Unlike the restriction on distributing handbills in *Schneider v. State*, 308 U.S. 147, 60 S. Ct. 146, 84 L. Ed. 155 (1939), the *Vincent* Court noted that the signs in this case remained until removed. *Vincent*, 466 U.S. at 809. Even in *Schneider* the Court recognized that a municipality has the right to penalize those who throw away literature broadcast in the streets. *Vincent*, 466 U.S. at 809.

Lastly, the Court acknowledged that even a time, place, and manner restriction may be invalid if the remaining modes of communication are inadequate. *Vincent*, 466 U.S. at 812. However, in the case of the Los Angeles ordinance, the Court found that it did not affect any individual's freedom to exercise the right to speak and distribute literature in the same place where signs were posted. *Id.*

In upholding the Los Angeles ordinance, the Court considered and rejected Taxpayers' argument that utility poles constitute a public forum requiring an enhanced scrutiny. The Court began by reiterating the nature of public forum:

"Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens."

*Id.* at 813 (quoting *Hague*, 307 U.S. at 515-16). The Court stated that Taxpayers' reliance on the public forum doctrine was misplaced and that it had failed to demonstrate the existence of a traditional right of access to items such as utility poles comparable to the right of access to public streets and parks. The Court recognized utility poles can be used as signposts but noted that "the mere fact that government property can be used as a vehicle for communication does not mean that the Constitution requires such uses to be permitted." *Id.* at 814. We have previously recognized the Court's holding in *Vincent* that utility poles are not a traditional public forum. *Collier*, 121 Wn.2d at 755.

Mighty Movers argues, however, that while Washington courts follow federal forum analysis, this court can reach a different conclusion using the same methodology. This suggestion is inconsistent with the way that Washington courts apply federal forum analysis, as illustrated by *Collier* and *Bering*, and we do not find it to be a reasonable approach. Rather than merely advisory, we have found United States Supreme Court decisions on what constitutes a public forum to be highly persuasive under article I, section 5 and have consistently followed them even though those decisions are not binding precedent.

We also do not agree that *Vincent* is confined to its facts. Mighty Movers says that the case represents only an "as applied" constitutional challenge. The Court of Appeals agreed, saying that the Court "narrowed its holding to the specific parties and record before it." *Mighty Movers*, 112 Wn. App. at 912. The United States Supreme Court did state that it would "limit [the] analysis of the constitutionality of the ordinance to the concrete case before us." *Vincent*, 466 U.S. at 803. However, the Court said this only because it rejected the facial overbreadth challenge brought by Taxpayers and because it concluded that since Taxpayers agreed that the ordinance was legal in some applications, it was not susceptible to the argument that it was facially invalid in all applications. *Vincent*, 466 U.S. at 803. Necessarily, therefore, the constitutionality of the ordinance was determined as applied. However, in addressing the specific argument that utility poles are a public forum, the Court concluded they were simply not of the same character as public parks or streets. The Court said Taxpayers

> fail to demonstrate the existence of a traditional right of access respecting such items as utility poles for purposes of their communication comparable to that recognized for public streets and parks[.] . . . [T]he "existence of a right to access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue."

*Id.* at 814 (quoting *Perry Educ. Ass'n,* 460 U.S. at 44).

*Krishna* is illustrative. There, the Court undertook to resolve a split in the federal circuits that had developed over whether an airport is a traditional public forum in order "to resolve whether airport terminals are public for[ums.]" *Krishna,* 505 U.S. at 677. The Court rejected the argument that airports are public forums, saying that "given the lateness with which the modern air terminal has made its appearance, it hardly qualifies for the description of having 'immemorially . . . time out of mind' been held in the public trust and used for purposes of expressive activity." *Krishna,* 505 U.S. at 680 (quoting *Hague,* 307 U.S. at 515). By resolving a split in the circuits on this question, the Court clearly indicated that the inquiry whether airport terminals are traditional public forums involves a determination of law as to the entire class, not a case by case analysis of each airport terminal.

Mighty Movers has also relied in this litigation on evidence that it maintains shows that the City's utility poles have traditionally been a public forum. While we find *Vincent* persuasive in its analysis, we note that even if we were to engage in an independent traditional public forum analysis, the evidence that Mighty Movers relies on would not convince us otherwise. It has been unlawful since 1953, under Washington statute, to attach signs or posters to utility poles. *See* RCW 70.54.090.[8] For this reason, Mighty Movers' reliance on a letter from a Seattle City Council president dated 1992 and referring to conditions prior to his campaign in 1981 is meaningless as evidence of a tradition of using utility poles as a public forum. The same is true of photographs taken in 1993 and 1994. The Court has re-

---

[8] Former RCW 70.54.090 (1953), effective until July 1, 2004, provided:

It shall be unlawful to attach to utility poles any of the following: Advertising signs, posters, vending machines, or any similar object which presents a hazard to, or endangers the lives of, electrical workers. Any attachment to utility poles shall only be made with the permission of the utility involved, and shall be placed not less than twelve feet above the surface of the ground.

The statute was amended, effective July 1, 2004, to provide that a violation is a misdemeanor. LAWS OF 2003, ch. 53, § 351. The substantive language has not changed.

jected the proposition that just because "an instrumentality 'is used for the communication of ideas or information' " it becomes a public forum. *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 130 n.6, 101 S. Ct. 2676, 69 L. Ed. 2d 517 (1981) (quoting *id.* at 137 (Brennan, J., concurring)). This conclusion is even more appropriate where the use has been illegal.

The *Vincent* ordinance and the Seattle ordinance are nearly identical. In both Los Angeles and Seattle signs were posted illegally. In Los Angeles, the weekly sign removal report indicated that there were 1,207 signs removed from public property during the week in which Vincent was posting signs. *Vincent*, 466 U.S. at 793. Traditional public forums are public properties that have "time out of mind" been used for the purpose of assembly and communicating thoughts between citizens, not public properties that have been used illegally. *See Hague*, 307 U.S. at 515; *U.S. Postal Serv.*, 453 U.S. at 128-29 (letter box for delivery and receipt of United States mail is not a public forum; access has been unlawful since 1934 except under terms and conditions specified by Congress and the United States Postal Service). The repeated illegal act of posting on utility poles did not turn the act of posting into a channel of communication in Los Angeles that has "time out of mind" been used for the purpose of communicating, nor do we accept the argument that it did so in Seattle.

Next, a photographic survey reported in the record, indicating the presence of 15 postings on 137 poles during the period 1920 to 1963, is simply inadequate in itself to show a long tradition of posting on utility poles. Mighty Movers also cites two early laws that it says show that this state's government has long endorsed posting as a way for citizens to communicate with the public at large. Neither law contains any reference to any posting on utility poles, however. 1897 BAL. CODE ch. XIX, § 689 (providing that towns were required to provide for suitable posts on which to put up notices); WASHINGTON TERRITORIAL CODE OF 1881, ch. XXXIV, § 359 (mandating that notice of execution

sales be posted in three public places in the county where the sale was to take place).

Mighty Movers also contends, though, that the ordinance is unconstitutional because it bans posting on utility poles located between the streets and sidewalks. Mighty Movers relies on the holding in *Collier* that the parking strips which lie between streets and sidewalks are part of the traditional public forum. The Court of Appeals agreed with this argument. *Mighty Movers*, 112 Wn. App. at 913.

In *Collier*, a municipal ordinance that limited the posting of political signs was challenged. *Collier*, 121 Wn.2d 737. As noted, based upon federal cases, this court determined that parking strips are public forums. However, it does not follow that any public structure that lies within a public forum itself becomes a public forum. Indeed, the United States Supreme Court rejected this argument in *Vincent*. *Vincent*, 466 U.S. at 813-15 (rejecting the argument that the public property covered by the Los Angeles ordinance "should be treated in the same respect as the 'public forum' in which the property is located"). The Court recognized that while utility poles are located within a traditional public forum, the poles do not, by virtue of that location, become a public forum. Accordingly, the location of some of the utility poles in Seattle's parking strips does not mean that the poles themselves are a public forum. *See also Preferred Communications, Inc. v. City of L.A.*, 754 F.2d 1396 (9th Cir. 1985) (rejecting the contention that merely because utility poles are located on or under public streets and rights-of-way they constitute a traditional public forum on the basis that the United States Supreme Court's decision in *Vincent* precluded such a conclusion). Each type of public property or structure must be considered on its own.

There is neither historical nor constitutional support for the characterization of a utility pole as a public forum. In order for utility poles to be a traditional public forum they must have the characteristics of one. *See Perry Educ. Ass'n*, 460 U.S. 37; *Collier*, 121 Wn.2d 737. Absent these charac-

teristics, they are not a public forum. Streets, sidewalks, and parks are classes of property that meet the public forum test. *See Collier*, 121 Wn.2d 737; *Hague*, 307 U.S. 496. Utility poles are an essential part of the City's power system and they have not been a traditional public forum nor have they been historically held open to the general public.

In accord with our precedent following the federal analysis and our reliance on federal cases applying that analysis to specific types of property, we follow *Vincent* and hold that utility poles are not a public forum.

Importantly, while utility poles can be used to post signs, the mere fact that government property can be used as a vehicle for communication does not mean that the Constitution requires such uses to be permitted. *Vincent*, 466 U.S. at 814. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property. . . ." *Cornelius*, 473 U.S. at 799-800. Any tangible property owned by the government could be used to communicate. To use the example posed by the *Vincent* Court, bumper stickers may be placed on government official automobiles and yet it cannot seriously be claimed that there is a constitutional right to attach bumper stickers to city-owned automobiles. *Vincent*, 466 U.S. at 814 n.31. Likewise, graffiti is a method of communication and people have utilized public structures as a canvas, including public buildings, bridges, aqueducts, etc. We do not believe that simply because graffiti can be placed on public property it must be analyzed under the heightened protection given to traditional public forums.

There must be some point at which the government's relationship to things under its dominion and control is treated in the same manner as a private owner's property interest in the same kinds of things, and in such circumstances, " '[t]he State, no less than a private owner of property, has power to preserve the property under its

control for the use to which it is lawfully dedicated.' " *U.S. Postal Serv.*, 453 U.S. at 129-30 (quoting *Greer v. Spock*, 424 U.S. 828, 836, 96 S. Ct. 1211, 47 L. Ed. 2d 505 (1976) and citing *Adderley v. Florida*, 385 U.S. 39, 47, 87 S. Ct. 242, 17 L. Ed. 2d 149 (1966)).

Because utility poles are a nonpublic forum, posting on utility poles may be regulated if "the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806; *see Ark. Educ. Television Comm'n*, 523 U.S. at 682; *Huff*, 111 Wn.2d at 927; *Eze*, 111 Wn.2d at 32. "The restriction ' "need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." ' " *Krishna*, 505 U.S. at 683 (quoting *United States v. Kokinda*, 497 U.S. 720, 730, 110 S. Ct. 3115, 111 L. Ed. 2d 571 (1990) (plurality opinion) (quoting *Cornelius*, 473 U.S. at 808)). Regulation of speech in nonpublic forums receives the least scrutiny of the categories of public property. *See Perry Educ. Ass'n*, 460 U.S. at 46. The government may use time, place, and manner regulations, as well as any additional restrictions that ensure the forum will be reserved for its governmentally intended purpose, *Perry Educ. Ass'n*, 460 U.S. at 46 and *Eze*, 111 Wn.2d at 32, though a party need not establish and a court need not engage in the "elaborate" time, place, and manner analysis applicable to public forums when a nonpublic forum is involved, *U.S. Postal Serv.*, 453 U.S. at 132-33.

■ Seattle's ordinance is reasonable in light of the primary purpose of utility poles, which is to support utility lines. Their secondary purpose is to provide for regulatory posting of signs by government. As noted, the City has the right " 'to preserve the property under its control for the use to which it is lawfully dedicated.' " *Greer*, 424 U.S. at 836 (quoting *Adderley*, 385 U.S. at 47). The City enacted the ordinance to protect the safety of utility workers who must climb the poles, to enhance public safety by promoting unobstructed vision for drivers and pedestrians, to prevent damage to public property, and to enhance urban aesthet-

ics. The Seattle City Council made the legislative determination that a prohibition against all private signs and posters on utility poles is the best way to protect worker safety and promote the other public interests at stake.

The ordinance is also content and viewpoint neutral. Where nonpublic forums are concerned, the Court said that "[i]mplicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity." *Perry Educ. Ass'n*, 460 U.S. at 49. The Court explained that "[t]hese distinctions . . . are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property." *Id.*

> Public property which is not by tradition or designation a forum for public communication may be reserved by the State "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."

*Vincent*, 466 U.S. at 814-15 (quoting *Perry Educ. Ass'n*, 460 U.S. at 46). Plainly, the Seattle ordinance satisfies the content-neutral requirement for nonpublic forums. Consistent with nonpublic forum precedent, the City can use utility poles for the placement of traffic, parking, and similar regulatory signs.

We also conclude that, like the ordinance at issue in *Vincent*, the Seattle ordinance does not prevent the public from exercising free speech rights on the public streets and in other public places. The public is free to picket and parade, to distribute handbills, and to carry signs. The public is also free to post signs and handbills on designated kiosks and poster boards designed by the City for that purpose. Thus, there are alternate channels of communication sufficient under the standard applicable to nonpublic forums. *See Vincent*, 466 U.S. at 812, 815; *Perry Educ. Ass'n*, 460 U.S. at 53-54.

We agree with the trial court and hold that the ordinance was enacted to achieve legitimate governmental purposes,

it is reasonable in light of the purposes served by utility poles, and it is content and viewpoint neutral.

Finally, the City requested attorney fees for its appeal, based upon Mighty Movers' stipulation to pay reasonable attorney fees as requested in the City's amended complaint if the constitutionality of the ordinance is upheld and upon SMC 15.48.120, which provides for reasonable attorney fees to the City as part of the costs of collecting amounts due for removal of illegal postings. The City pointed out that the trial court awarded attorney fees to the City and argued it was therefore entitled to them on appeal. We agree the City is entitled to attorney fees and direct an award of reasonable fees be made both for the appeal and for the discretionary review in this court. *See* RAP 18.1.

## Conclusion

Washington follows federal forum analysis and *Vincent* has established that utility poles are not a traditional public forum. We uphold the ordinance as a content neutral regulation governing a nonpublic forum. The ordinance is reasonable legislation in light of the purposes served by utility poles. We reverse the Court of Appeals and reinstate the trial court's summary judgment in favor of the City.

JOHNSON, IRELAND, BRIDGE, and FAIRHURST, JJ., concur.

ALEXANDER, C.J. (concurring) — I agree with the majority that Seattle's public utility poles are not a traditional public forum as defined by our state constitution. As it points out, the restrictions imposed since 1953 by RCW 70.54.090 belie the notion that utility poles are such a forum. Majority at 357-58. Although the survey of historical photographs cited by the dissent is somewhat compelling, this evidence does not, in my view, trump a statutory restriction that has been in place for half a century. I, therefore, join the majority opinion.

I write separately simply to express my disagreement with the majority opinion to the extent it suggests that we

are bound by a decision of the United States Supreme Court holding that public utility poles are not a traditional public forum under the first amendment to the federal constitution. Majority at 356. Although we have adopted the federal court's analysis for determining whether a particular location is a traditional public forum, *see City of Seattle v. Huff*, 111 Wn.2d 923, 927-28, 767 P.2d 572 (1989), that does not mean that we must reach the same conclusion under our state constitution.

SANDERS, J. (dissenting) — Mighty Movers, Inc., asserted article I, section 5 of the Washington Constitution as an affirmative defense to the city of Seattle's action commenced against it for fines and penalties. Despite this bulwark constitutional provision's unequivocal guaranty that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right" (article I, section 5), today's majority denies Mighty Movers the right to speak, write, and publish in a manner utilized since statehood. I dissent.

I. Seattle Public Utility Poles Are Public Fora

Article I, section 5 differs significantly from the First Amendment, and it is well settled its protections afforded constitute a "preferred right." *O'Day v. King County*, 109 Wn.2d 796, 803-04, 749 P.2d 142 (1988). Because of this preference we have repeatedly held it more protective of the Washington citizen's right to free speech than its federal counterpart in the areas of overbreadth and time, place, and manner restrictions. *See Collier v. City of Tacoma*, 121 Wn.2d 737, 747-48, 854 P.2d 1046 (1993); *O'Day*, 109 Wn.2d at 803-04.

But the time, place, and manner restriction at issue here flatly prohibits "*anyone* [from] affix[ing] *any* handbill, sign, or poster upon *any* traffic control device, *utility pole*, lamp post, City-owned structure, or City-owned tree or shrubbery *in any public place*." Seattle Ordinance 117066, § 1 (Mar. 7, 1994) (emphasis added), *codified at* former SEATTLE MUNICI-

PAL CODE 15.48.100 (1994). The only exception to this wholesale proscription is the grossly insufficient alternative to use "poster boards and kiosks that are designated for handbills and signs." *Id.*[9] Thus, while article I, section 5 of our constitution allows the citizens to speak "freely," exercise of this right was limited to a handful of unlikely places designated by the city.

The principal issue here is whether public utility poles in Seattle constitute a traditional public forum in which Washingtonians have enjoyed a right of access to communicate their thoughts, ideas, and views.[10] The majority's approval of this speech infringement is based on its bare assertion "utility poles are not a public forum." Majority at 360. To reach its result the majority cites *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984), wherein the United States Supreme Court held utility poles in Los Angeles were not public fora under the First Amendment. But the Supreme Court so held because *those* free speech proponents "fail[ed] to demonstrate the existence of a traditional right of access respecting such items as utility poles for purposes of their communication comparable to that recognized for public streets and parks." *Id.* at 814. Though the majority attempts to broaden *Vincent* beyond its factual context, the Supreme Court found the Los Angeles ordinance unconstitutional *as applied*, "limit[ing its] analysis of the constitutionality of the ordinance to the concrete case before [the Court]." *Id.* at 803. Contrary to that expressed by our majority, the Supreme Court did not suggest that utility

---

[9] This record demonstrates there were 11 such kiosks at the time the city filed the instant lawsuit, which equates to one kiosk for every 51,216 Seattle residents. *See* CITY OF SEATTLE, CITY PROFILE, *at* http://www.seattle.gov/oir/datasheet/location.htm (last visited Sept. 1, 2004) (providing that Seattle's population as of 2000 was 563,374 people).

[10] Because Mighty Movers argues overbreadth in its facial challenge to the constitutionality of the city ordinance, it is irrelevant the speech at issue in the present case is commercial rather than political. *See City of Seattle v. Webster*, 115 Wn.2d 635, 640, 802 P.2d 1333 (1990). That said, I emphasize article I, section 5 makes no distinction whatsoever between one type of speech and another. Though it seems elementary, article I, section 5 by its very terms protects *all* speech with equal force regardless of the nature of the message conveyed.

poles would never be a public forum but rather on that specific factual record pertaining to Los Angeles, they were not proved to be such.[11]

The majority nonetheless clings to the federal result from this wholly different factual context,[12] asserting this court's reliance on federal public forum analysis compels identical results in Seattle. I disagree. Unlike the Los Angeles free speech proponents in *Vincent*, Mighty Movers submitted a wealth of uncontroverted factual support for the proposition that Seattle utility poles have been traditionally and historically used as a forum for communication. *See infra* pp. 370-71. *Vincent*'s self-imposed limitation of its holding "to the concrete case before [the Court]," *Vincent*, 466 U.S. at 803, readily distinguishes our case, as, in theory, it must.

That said, Mighty Movers did not raise the First Amendment in defense to the city's lawsuit; rather it claimed our state constitution should control the question presented. "Ordinary rules of textual and constitutional interpretation, as well as the logic of federalism, require that meaning be given to the differences in language between the Washington and U.S. Constitutions, and that even identically worded provisions be interpreted independently . . . ." ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION: A REFERENCE GUIDE 10 (2002). Regardless of what previously transpired in federal First Amendment litigation—on a different factual record no less—it cannot rob our state constitution of its independent life and vitality.

As this court reaffirmed over a decade ago:

---

[11] Indeed, to expand *Vincent*'s "holding" beyond its factual context contradicts the true definition of the term, which is "[a] court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision." BLACK'S LAW DICTIONARY 749 (8th ed. 2004).

[12] Describing *Vincent*'s shortcomings one prominent scholar opined: "In a cloud of logic that threatened quickly to evaporate in circles of tautology, the Court argued that these signposts were not public forums because the Constitution didn't say they were." LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 12-24, at 996 (2d ed. 1988). Though *Vincent* is factually distinguishable, I join Professor Tribe's prophetic criticism which applies to today's majority with equal force.

*"[T]his court has a duty, where feasible, to resolve constitutional questions first under the provisions of our own state constitution before turning to federal law."* We do so because in addition to our responsibility to interpret Washington's constitution, we must furnish a rational basis "for counsel to predict the future course of state decisional law." We recognize that the free speech clauses of the state and federal constitutions are different in wording and effect, *but that the result reached by previous Washington cases in general adopted much of the federal methodology for application to state constitutional cases. The federal cases cited here and in our prior decisions are used for the purpose of guidance and do not themselves compel the result the court reaches under our state constitution.*

*Collier*, 121 Wn.2d at 745-46 (emphasis added) (citations omitted) (quoting *O'Day*, 109 Wn.2d at 801-02, and *State v. Gunwall*, 106 Wn.2d 54, 60, 720 P.2d 808 (1986)). Thus, *Vincent* is instructive at best and inapposite at worst.

*Collier*, however, is directly on point. There we applied article I, section 5 to staked political signs in parking strips between streets and sidewalks. *Id.* at 746-47. Beginning with the tenet that parks, streets, and sidewalks qualify as traditional public fora, we held, "[t]he parking strips . . . lie between the 'streets and sidewalks' and thus are part of the 'traditional public forum'. " *Id.* at 747 (footnote omitted). *Collier* consequently invalidated that portion of the city ordinance prohibiting the staking of political signs in this area. *Id.* at 763. While staking political signs in parking strips is somewhat different from posting on utility poles, many of these utility poles were also located on parking strips.

Holding parking strips were part of the public forum, *Collier* cited some federal precedent. *See id.* at 746-47 (quoting and citing *Burson v. Freeman*, 504 U.S. 191, 196-97, 112 S. Ct. 1846, 119 L. Ed. 2d 5 (1992); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983); and *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515, 59 S. Ct. 954, 83 L. Ed. 1423 (1939) (opinion of Roberts, J.)). However none of those cases held parking strips were part of the public forum. *Collier*

did not conclude parking strips were part of the public forum *because* of United States Supreme Court precedent. There simply wasn't any. Rather it was our *state* constitution which compelled *Collier*'s result. *See id.* at 745-46. Indeed the United States Supreme Court has yet to address whether parking strips anywhere are public fora under the First Amendment. Accepting the majority's position that federal methodology ipso facto compels any particular result would require this court to one day overrule *Collier* in the event the Supreme Court someday holds any parking strip anywhere is a nonpublic forum under the First Amendment. This would undeniably violate our "duty" to interpret article I, section 5, independent of the federal constitution. *O'Day*, 109 Wn.2d at 801.

Nor is the authority cited by the majority persuasive to the contrary. First, *Bering v. Share*, 106 Wn.2d 212, 721 P.2d 918 (1986), did rely on federal precedent to hold streets and sidewalks were public fora under the state constitution. *Id.* at 221-22. However, that analysis was compelled by the fundamental rule that the federal constitution establishes a floor beneath which our state constitution cannot sink. *World Wide Video, Inc. v. City of Tukwila*, 117 Wn.2d 382, 387, 816 P.2d 18 (1991). Thus, a public forum under the First Amendment is *necessarily* a public forum under article I, section 5, thereby requiring no independent state analysis to conclude sidewalks and streets are public fora under the state constitution. The majority's reliance on *Bering* is misplaced.

Second, the majority's citation to *Southcenter Joint Venture v. National Democratic Policy Committee*, 113 Wn.2d 413, 780 P.2d 1282 (1989), is equally unconvincing. That case addressed whether state action must be found under article I, section 5 to find a constitutional violation. *Id.* at 419. Recognizing the structure of the constitution requires state action in some contexts, we rejected the National Democratic Policy Committee's request to essentially "declare that our state constitution grants *an entirely new kind* of free speech right—one that can be used not only as a

shield by private individuals against actions of the state but also as a sword against other private individuals." *Id.* at 421. Rather than asking this court "to act contrary to the fundamental nature of our own state constitution," *id.*, Mighty Movers merely asks this court to independently analyze Seattle's sign posting tradition under accepted methodology.

Traditional public fora under article I, section 5 are those public properties which " 'by long tradition or by government fiat have been devoted to assembly and debate.' " *City of Seattle v. Huff*, 111 Wn.2d 923, 927, 767 P.2d 572 (1989) (quoting *Perry Educ. Ass'n*, 460 U.S. at 45, and citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985)). Speech restrictions in the public forum must satisfy strict scrutiny to pass constitutional muster. *See Collier*, 121 Wn.2d at 747.

Unlike those at issue in *Vincent, these* utility poles qualify as public fora under the unchallenged facts in this record. Many of the utility poles at issue here were located in parking strips, which *Collier* holds are part of the public forum under our state constitution. *Collier*, 121 Wn.2d at 747. Furthermore, this record demonstrates posting, especially on utility poles, has been a generally employed method of communicating in Seattle for nearly a century. Amongst the substantial and uncontroverted historical evidence in this record is a survey of historical photographs dating back to the 1920s prepared at the city's request. The survey demonstrates that from the reviewed photographic evidence, posters and handbills are evident on 11 percent of the poles photographed. The record also includes a 1910 photograph depicting members of the Washington Equal Suffrage Association posting political signs "in typical Seattle style." Clerk's Papers (CP) at 708. Moreover a letter dated November 24, 1992 from then Seattle City Council President George Benson states, "It was prior to the election of 1981 that I mounted a campaign to eliminate bill posting on utility poles," indicating the existence of posting

for at least the prior 23 years. CP at 735. The record also includes a "Poster Removal Program Survey" completed by the Seattle Conservation Corps, which contains at least 348 photographs taken in 1993 and 1994, depicting Seattle utility poles covered in hundreds of temporary signs. CP at 532-624.

Furthermore, despite the majority's indifference, posting has been an accepted—and statutorily mandated—avenue of communication since before statehood. An 1895 Washington law provided:

> Public places for posting notices.
>
> Sec. 110. At the annual town meeting in each year, the legal voters present at each meeting shall determine and designate three places in the town as public or the most public places of such town, and that all legal notices required to be posted in three public or the most public places of a town shall be posted up at such places. . . .

LAWS OF 1895, ch. CLXXV, § 110. This law explicitly provided that voters had a duty to identify public places for posting of legal notices. Similarly the Washington Territorial Code of 1881 mandated that execution sales be published by "posting written or printed notice of the time and place of sale in three public places of the county where the sale is to take place." CODE OF 1881, ch. XXXIV, § 359(1).

Yet the majority discounts this evidence by placing undue reliance on language in *Vincent* regarding " ' "time out of mind." ' " Majority at 355 (quoting *Vincent*, 466 U.S. at 813) (quoting *Hague*, 307 U.S. at 515-16). However this language was a specific reference to streets and parks, not a constitutional requirement that every traditional public forum may exist only if it has so existed for "time out of mind." Such a standard proffered by the majority would preempt from consideration any forum which did not exist in ancient Greece, eliminating consideration of not only utility poles but also airports, railroad stations, electronic communication, and virtually every incidence of modern life. For example when *International Society for Krishna*

*Consciousness, Inc., v. Lee,* 505 U.S. 672, 683, 112 S. Ct. 2701, 120 L. Ed. 2d 541 (1992) held airports were not public fora, the Court did not look to the practices of antiquity but rather asked the more meaningful question of whether an airport's " 'principal purpose [was the] free exchange of ideas.' " *Id.* at 679 (quoting *Cornelius,* 473 U.S. at 800). Moreover the Court rejected the argument that it would consider the traditional role of any particular government property only in connection with other analogous properties, concluding each forum analysis would require "*a new inquiry* whether the transportation necessities [were] compatible with various kinds of expressive activity." *Id.* at 681 (emphasis added). Thus the traditional public forum analysis must consider the actual and traditional use of the property at issue. The actual and traditional use of Seattle utility poles has, in fact, been a forum for communication of ideas.

More fundamentally our state constitution cannot be paralyzed in its application to those factual circumstances which existed only at ratification much less the millennia preceding it. It is a statement of general principles to govern the relationship between the private citizen and his or her government. "[T]he constitution was formulated not for a day or a year, but for all time." *State ex rel. Mullen v. Howell,* 107 Wash. 167, 180-81, 181 P. 920 (1919).

In search of further support to justify its denial of free speech the majority cites a statutory prohibition against posting on utility poles "[a]dvertising signs, posters, vending machines, or any similar object which presents a hazard to, or endangers the lives of, electrical workers." Former RCW 70.54.090(1) (1953), *cited in* majority at 357 & n.8. This statute was enacted in 1953, *Laws of* 1953, ch. 185, § 1, 74 years after statehood. Three reasons negate the majority's reliance on this statute. First, the statutory prohibition against utility pole posting is limited by its terms to those situations "which present[ ] a hazard to, or endanger[ ] the lives of, electrical workers," a much narrower prohibition than the Seattle ordinance which completely prohibits private postings without regard to place or manner. Second,

the prohibition took effect well after the posting laws quoted above, one of which applied to Washington citizens before the October 1889 ratification of the Washington Constitution. And finally, even if RCW 70.54.090 attempted to restrict that constitutionally protected public free speech forum, the constitutional rights of our citizens may not be altered by statute. As is expressly stated, "The provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise." CONST. art. I, § 29. Nothing in article I, section 5 softens the mandatory protection of the right to speak freely, and nothing allows such abrogation by statute. If it did, article I, section 29 would be rendered meaningless.

As such, the public utility poles at issue *in this case* are public fora and are subject to strict scrutiny.[13]

## II. Strict Scrutiny Commands Invalidation

A regulation burdening speech in a public forum must be (1) content neutral, (2) narrowly tailored to serve a compelling interest, and (3) leave open ample alternative means of communication to withstand constitutional challenge. *Collier*, 121 Wn.2d at 747. The burden is on the city to justify any restriction on speech, *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 114, 937 P.2d 154, 943 P.2d 1358 (1997), and it must prove each of these elements, *Collier*, 121 Wn.2d at 753. The city fails its burden because this antiposting ordinance is neither content neutral nor narrowly tailored to serve a compelling state interest.

This ordinance is not content neutral because it specifically exempts from its application "traffic, parking and other regulatory signs posted under the auspices of a public agency with the permission of the City." Former SEATTLE

---

[13] The majority's claim that this view would lead to overpasses and city-owned shrubberies qualifying as public fora is unfounded. Any speech proponent in the future would have to show the same tradition and right of access as Seattleites have shown with respect to public utility poles between the street and sidewalk. I agree with the majority that "[t]here must be some point at which the government's relationship to things under its dominion and control is treated in the same manner as a private owner's property interest in the same kinds of things." Majority at 360. But that point is not here.

Municipal Code (SMC) 15.48.100. Thus, for example, the city might post a notice of land use action on a utility pole consistent with the ordinance although a private person would be denied the equivalent opportunity to post an identical handbill protesting the action. In other words the ordinance facilitates government speech while prohibiting private speech. This is not neutrality. *See Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1572 (11th Cir. 1993) (ordinance prohibiting display of any flag, but specifically excepting government flags, was not content neutral and therefore unconstitutional); *Village of Schaumburg v. Jeep Eagle Sales Corp.*, 285 Ill. App. 3d 481, 487, 676 N.E.2d 200, 204, 221 Ill. Dec. 679 (1996) (same).

Nor is the antiposting ordinance at issue narrowly tailored to serve a compelling state interest. A compelling purpose must be a fundamental one, and the ordinance must be a reasonable vehicle to achieve that purpose. *Collier*, 121 Wn.2d at 754. The court determines the reasonableness of a time, place, and manner restriction by analyzing the public interest purportedly advanced by the regulation and the extent of the restriction. *Id*. This ordinance is exceedingly broad: "It is unlawful for *anyone* to affix *any* handbill, sign, or poster upon *any* traffic control device, utility pole, lamp post, City-owned structure, or City-owned tree or shrubbery in *any public* place." Former SMC 15.48.100 (emphasis added). Given the broad sweep of the ordinance it is difficult to argue every application of the ordinance is necessarily narrowly tailored to advance a "compelling" interest.

The city claimed numerous justifications for the ordinance, such as fire safety, utility worker safety, traffic safety, and aesthetics.

First, this court has readily rejected aesthetics as a compelling interest to justify limitations on otherwise protected free speech activity. "Although aesthetics has been determined to be a significant governmental interest, it has not been determined to be an interest sufficiently compel-

ling to justify restrictions on political speech in a public forum." *Collier*, 121 Wn.2d at 754 (citation omitted).

Second, even assuming some or all of the above concerns are "compelling," posters could be taped rather than nailed or stapled, and no more than one layer of postings might be allowed. Yet the ordinance at hand made no such distinction but rather imposes an absolute proscription against speech in the designated area. Moreover, the city's claims that utility workers may be injured by nails in the utility poles and that multiple layers of postings make it difficult to climb poles are belied by the government exemption to do just that, namely to post "traffic, parking and other regulatory signs posted under the auspices of a public agency with the permission of the City." Former SMC 15.48.100. I posit a nail posting a traffic, parking, or regulatory sign can cause just as much injury as a nail posting a political sign. Indeed, the ease with which the city could have narrowed the focus of the ordinance to address alleged worker and traffic safety issues is illustrated by Seattle Ordinance 121038, passed December 16, 2002, which obviously serves as an example of how the ordinance could have employed a narrower approach in lieu of an outright ban on private posting.[14]

---

[14] The amended antiposting ordinance reads in part:

A. Handbills, signs and posters may be affixed to City-owned utility poles, lamp poles and traffic control devices under the control of the Seattle Department of Transportation, except for freestanding stop signs and yield signs, and their posts, in accordance with the rules promulgated by the Director of the Seattle Department of Transportation pursuant to Chapter 3.02, the Seattle Administrative Code. Those rules shall regulate the time, place and manner of posting so as to advance the public purposes stated above so that (1) members of the public are afforded reasonable access to exercise their free speech rights, including being able to place signs at a height determined by the Director to be reasonable, consistent with other public purposes, which height shall not be greater than twelve (12) feet from the surface of the ground; and (2) handbills, signs, and posters affixed to any City-owned traffic control device, utility pole or lamp post will not unreasonably (a) contribute to a traffic hazard; (b) contribute to a safety hazard to anyone working on a utility pole, lamp pole or traffic control device; (c) contribute to a risk of fire; (d) contribute to visual blight; or (e) cause damage to City-owned property.

SMC 15.48.105(A) (2002).

## CONCLUSION

The majority inappropriately distorts federal constitutional precedent without regard to its factual context and undermines an independently ascertainable state constitutional result. Because of Washington's and Seattle's rich history of posting on utility poles, such is a public forum worthy of the highest constitutional protection under article I, section 5. And because the restriction at issue cannot survive strict scrutiny, it must fail. I would affirm the Court of Appeals and dismiss this action against Mighty Movers, thus compelling my dissent from a majority which turns its back on the citizens' right to "freely speak, write and publish on all subjects." CONST. art. I, § 5.

CHAMBERS and OWENS, JJ., concur with SANDERS, J.