148 P.3d 1102 (2006)
Ed HERBERT, Appellant,
v.
WASHINGTON STATE PUBLIC DISCLOSURE COMMISSION, Respondent.
Dennis Nusbaum, Appellant,
v.
Washington State Public Disclosure Commission, Respondent.
Nos. 57502-3-I, 57503-1-I.
Court of Appeals of Washington, Division 1.
December 18, 2006.
*1104 Harriet Kay Strasberg, Attorney at Law, Olympia, WA, for Appellants.
Linda Anne Dalton, Atty General's Office, Govt & Enforcement, H. Bruce Marvin, WA State Attorney General's Office, Olympia, WA, for Respondent.
COLEMAN, J.
¶ 1 Ed Herbert and Dennis Nusbaum are public school teachers who were fined by the Public Disclosure Commission (PDC) for using school facilities in violation of RCW 42.17.130's prohibition on the use of public resources for political advocacy. They challenge the constitutionality of that statute as applied to them, arguing that it does not pass strict scrutiny as a restriction on their First Amendment free speech rights and that the statute as applied is arbitrary and capricious and overbroad. We conclude that the PDC's application of the statute is constitutional because it is a reasonable and viewpoint neutral speech restriction in a nonpublic forum and that the statute as applied is not arbitrary and capricious or overbroad. Therefore, we affirm the PDC's final order.

FACTS
¶ 2 Herbert and Nusbaum[1] are Seattle School District teachers at Ballard High School. Herbert volunteers as a building representative for the Seattle Education Association (SEA), which is an affiliate of the *1105 Washington Education Association, a voluntary statewide labor organization. As an SEA building representative, Herbert regularly distributes SEA information to members employed at Ballard via school mailboxes or school e-mail. The Seattle School District provides e-mail accounts to its employees, subject to a use agreement that prohibits the use of school computers to support or oppose ballot measures.
¶ 3 In 2004, SEA members supported Referendum 55 and Initiative 884. Herbert placed blank petitions for the ballot measures in teachers' school mailboxes so that they could collect signatures to place those measures on the ballot. He directed them to place completed petitions in his school mailbox. One morning before school started, Herbert received an e-mail message from an SEA staff member notifying him that petitions would be collected that afternoon. Herbert forwarded this e-mail to all Ballard staff, instructing them to place any completed petitions in his school mailbox that day.
¶ 4 The Washington State PDC received a complaint that Herbert had violated RCW 42.17.130 by using public resources to support the ballot measure campaigns. Following an investigation, the PDC held an administrative hearing. Herbert stipulated to the underlying facts, and based on those stipulations and the evidence and testimony offered at the hearing, the PDC determined that Herbert had violated the statute. The PDC assessed a $500 penalty against Herbert, with $450 suspended if he did not violate the statute again for two years.
¶ 5 Herbert filed a petition for judicial review under the Administrative Procedure Act (APA) in King County Superior Court. He argued that the PDC had misapplied the law and that its order was unconstitutional. The superior court affirmed the PDC's order, and Herbert timely appeals.

STANDARD OF REVIEW

FACTS
¶ 6 Under the APA, an appellate court shall reverse an administrative order if it determines that, inter alia, (1) the administrative agency has erroneously interpreted or applied the law, (2) the order, or the statute on which the order is based, is unconstitutional on its face or as applied, or (3) the order is arbitrary and capricious. RCW 34.05.570(3). In reviewing the administrative order, this court is in the same position as the superior court  applying the APA standards to the administrative record before the agency. Tapper v. Employment Sec. Dep't, 122 Wash.2d 397, 402, 858 P.2d 494 (1993). This court reviews the administrative record de novo, but gives substantial weight to the agency's interpretation of the law it administers, particularly when the agency has expertise in a certain area. Franklin County Sheriff's Office v. Sellers, 97 Wash.2d 317, 325-26, 646 P.2d 113 (1982).

ANALYSIS
Scope of RCW 42.17.130
¶ 7 Herbert argues that the PDC erroneously interpreted and applied RCW 42.17.130 to find he violated the statute because his "use" of government facilities was de minimus. Even if he did use the facilities, he claims this conduct was part of the "normal and regular" conduct of the school district and, thus, not subject to the statute. The PDC argues that there is no de minimus exception to RCW 42.17.130 and that using school e-mail and mailboxes for political advocacy is not "normal and regular conduct" of Ballard High School or the school district.
¶ 8 Washington voters passed Initiative 276 in 1972, which enacted a series of laws related to campaign finance reform. See RCW 42.17.010. The PDC was created as part of Initiative 276 to enforce the provisions of the initiative's campaign finance laws. RCW 42.17.350-60. One of the laws enacted by Initiative 276 reads:
No elective official nor any employee of his [or her] office nor any person appointed to or employed by any public office or agency may use or authorize the use of any of the facilities of a public office or agency, directly or indirectly, for the purpose of assisting a campaign for election of any person to any office or for the promotion of or opposition to any ballot proposition. *1106 Facilities of a public office or agency include, but are not limited to, use of stationery, postage, machines, and equipment, use of employees of the office or agency during working hours, vehicles, office space, publications of the office or agency, and clientele lists of persons served by the office or agency. However, this does not apply to the following activities:
. . . .
(3) Activities which are part of the normal and regular conduct of the office or agency.
RCW 42.17.130. Herbert argues that the statute's prohibition on the "use" of facilities, in the absence of any definition of the word, should be interpreted to prohibit only those uses that have a measurable monetary value. According to Herbert, because his forwarding of an e-mail and the deposit of petitions in mailboxes uses a negligible amount of time and resources, it was essentially a de minimus use and should not have been considered a violation of the statute.
¶ 9 The PDC points out that the statute does not contain any de minimus use exception in its wording and that the PDC repealed a WAC section that contained a de minimus use exception in 1978 and replaced it with a WAC section without such an exception. Compare WAC 390-04-040 (repealed) with WAC 390-05-273.
¶ 10 Thus, because the statute is undisputedly unambiguous and does not contain a de minimus use exception, we decline to impose one. See State v. Bostrom, 127 Wash.2d 580, 586-87, 902 P.2d 157 (1995) ("When the language of a statute is unambiguous, courts may not alter the statute's plain meaning by construction."). We reject Herbert's argument that such an exception should be implied, particularly in light of the fact that the PDC repealed a de minimus use exception in its administrative regulations, and the fact that Herbert has not shown a clear way to define a de minimus exception.
¶ 11 Second, Herbert claims that because the e-mail was part of the "normal and regular" conduct of the school, his use is covered by the proviso to RCW 42.17.130's prohibition. WAC 390-05-273 explains that the "normal and regular" proviso means:
Normal and regular conduct of a public office or agency, as that term is used in the proviso to RCW 42.17.130, means conduct which is (1) lawful, i.e., specifically authorized, either expressly or by necessary implication, in an appropriate enactment, and (2) usual, i.e., not effected or authorized in or by some extraordinary means or manner. No local office or agency may authorize a use of public facilities for the purpose of assisting a candidate's campaign or promoting or opposing a ballot proposition, in the absence of a constitutional, charter, or statutory provision separately authorizing such use.
Herbert has not cited any constitutional, charter, or statutory provision separately authorizing the use of Seattle School District e-mail or mailboxes for the purposes of promoting a ballot measure, and his use of e-mail had been specifically prohibited by the school district computer policy. There is no evidence that Ballard High School or the school district customarily engaged in distributing political materials, and thus, Herbert's actions were not within the "normal and regular conduct of a public office or agency." We thus conclude that this proviso to RCW 42.17.130 does not apply to Herbert's use.
¶ 12 Thus, because RCW 42.17.130 does not contain a de minimus exception and the "normal and regular" proviso does not apply here, we conclude that the PDC did not err in finding that Herbert's conduct violated the statute.
Tests for Determining Constitutionality
¶ 13 Herbert argues that even if he violated the statute, the statute is unconstitutional as applied here because it is not narrowly tailored to protect a compelling government interest and his use did not cause a material and substantial disruption to the school. The PDC argues that because RCW 42.17.130 restricts certain forms of speech of public employees in certain forums, forum analysis is the appropriate test to determine whether the restrictions are constitutional.
¶ 14 The First Amendment's guarantee of free speech applies in schools and *1107 other employment locations, but the United States Supreme Court has noted that "`[Nowhere] [have we] suggested that students, teachers, or anyone else has an absolute constitutional right to use all parts of a school building or its immediate environs for . . . unlimited expressive purposes.'" Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (quoting Grayned v. City of Rockford, 408 U.S. 104, 117-18, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). RCW 42.17.130 prohibits the use of public facilities for political advocacy by public employees, and a variety of tests are used by courts to determine whether such limits on expression are constitutional.
¶ 15 Herbert urges us to apply strict scrutiny because this is a content-based restriction (its prohibition singles out political advocacy speech). Herbert cites State v. Williams, 144 Wash.2d 197, 26 P.3d 890 (2001) and Collier v. City of Tacoma, 121 Wash.2d 737, 854 P.2d 1046 (1993) to support the application of strict scrutiny to content-based restrictions. In Williams, the statute at issue defined harassment, and the court applied strict scrutiny to the statute because it purported to prohibit speech based on its content (whether it was threatening to the victim's "mental health"). While true threats to physical safety are not protected by the First Amendment, threats to mental health could be protected. The court concluded that after applying strict scrutiny, the content-based restriction was not necessary to promote a compelling government interest and was not narrowly tailored to achieve that purpose. Williams, 144 Wash.2d at 211, 26 P.3d 890.
¶ 16 The type of speech prohibited in Williams is easily distinguishable from the type prohibited in RCW 42.17.130, because the Williams speech occurred in conversations between two people  no matter what the setting  whereas the prohibited speech here is only that speech that requires the use of public facilities. The prohibition is on the use of facilities, not on political speech generally in the school setting (and the WAC makes clear that school employees may express their political views in any way that does not use public facilities). Forum analysis would not have been helpful in Williams because the statute did not criminalize speech in a forum-dependent way.
¶ 17 In Collier, the other Washington case cited by Herbert to support the application of strict scrutiny as opposed to forum analysis, the ordinance at issue restricted the use of political yard signs on public parking strips. The court concluded that parking strips are a public forum, and as such, the restriction must be subjected to strict scrutiny. Thus, Collier does not support Herbert's position because the court actually applied forum analysis to determine that the forum at issue was a public forum, and restrictions in a public forum are reviewed under strict scrutiny.
¶ 18 The PDC argues that because RCW 42.17.130 was applied to prohibit political advocacy using public computers and school mailboxes  forums that are open to other types of communication  this type of forum limitation requires review using forum analysis. It cites City of Seattle v. Huff, 111 Wash.2d 923, 926, 767 P.2d 572 (1989), which states that federal case law applying forum analysis is highly persuasive and has been consistently followed in Washington. Huff explains the steps of forum analysis:
The constitution allows regulation of protected speech in certain circumstances. Bering v. SHARE, 106 Wash.2d 212, 221-22, 721 P.2d 918 (1986), cert. dismissed, 479 U.S. 1050, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987). Speech in public forums is subject to valid time, place, and manner restrictions which "`are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" Bering, at 222, 721 P.2d 918 (quoting United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)). "Additional restrictions [on speech in public forums] such as an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling governmental interest." United States v. Grace, supra at 177, 103 S.Ct. 1702.

*1108 A different standard applies to speech in nonpublic forums. Speech in nonpublic forums may be restricted if "`. . . the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'" Seattle v. Eze, [111 Wash.2d 22], 32, [759 P.2d 366 (1988)] (quoting Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)).
The parties did not address the public/nonpublic forum distinction. This threshold question is critical, however, because the type of forum determines which constitutional standard applies when protected speech is sought to be regulated.
Huff, 111 Wash.2d at 926, 767 P.2d 572. Forum analysis has been applied in cases factually similar to Herbert's case. See, e.g., Perry, 460 U.S. at 47, 103 S.Ct. 948 (addressing restriction on union members' access to school mailbox system); Chiu v. Plano Indep. Sch. Dist., 260 F.3d 330, 350 (5th Cir. 2001) (addressing restriction on parents' use of school mailbox system); May v. Evansville-Vanderburgh School Corp., 787 F.2d 1105, 1118 (7th Cir.1986) (addressing restriction on teachers' use of facilities to hold meeting on school premises).
¶ 19 Herbert points out that the Fifth Circuit Court of Appeals did not apply forum analysis in a case similar to Herbert's, Texas State Teachers Ass'n v. Garland Indep. Sch. Dist., 777 F.2d 1046 (5th Cir.1985), and instead applied the "material and substantial disruption" test from Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (holding that student speech can be restricted only when the communication or method thereof causes a material and substantial disruption to the school). The Garland court stated that the Tinker test applied to speech restrictions on school "insiders," as opposed to "outsiders" like unions.
¶ 20 In Garland, the school district enacted a policy whereby teachers could not, inter alia, use the internal mailbox system to discuss the labor union on school premises during school hours. The teachers could use the school mail system for any other purpose, including personal matters. The policy was defended by the school district as being necessary for compliance with a Texas Education Code section that forbade districts from coercing teachers to join any organization. The Garland court stated that the policy was not necessary for compliance with the Code (because if all matters may be discussed via school mail, there can be no possible coercion), and that no material or substantial disruption had been shown by the teachers' use of the school mail system to discuss employee organizations. Garland, 777 F.2d at 1055.
¶ 21 Garland cites other Fifth Circuit cases for the proposition that restrictions on teacher conversations among other teachers are reviewed under the Tinker test and applies the same test  without explaining any specific reasons for doing so  to the use of the school mailbox system. Herbert argues that this court should thus apply the Tinker test because here the communications were also between school "insiders." But the Tinker test predates the use of forum analysis, and subsequent cases have applied forum analysis even when the speech restriction at issue involves only "insiders." See, e.g., Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). Some federal courts have suggested that the "insider"/ "outsider" dichotomy is no longer relevant because of the use of forum analysis. See Hedges v. Wauconda Cmty. Unit Sch. Dist. 118, 807 F.Supp. 444, 456-57 (N.D.Ill. 1992) and Nelson v. Moline Sch. Dist., 725 F.Supp. 965, 973 (C.D.Ill.1989). And the Ninth Circuit has recently applied forum analysis to restrictions on public employees' use of public facilities at work for "insider" meetings. See Berry v. Dep't of Soc. Servs., 447 F.3d 642, 652-54 (9th Cir.2006) (applying forum analysis to prohibition of public employee using employee conference room for prayer meeting).
¶ 22 Herbert attempts to distinguish Berry because it did not involve a content-based restriction, because the employer there forbade any nonwork-related use of the employee conference room  the employee's use was not prohibited because it was for religious purposes, but only because it was not work-related. But in other cases that have involved *1109 content-based restrictions, courts have applied forum analysis, suggesting that whether a restriction is content-based does not affect whether forum analysis should be applied  although whether a restriction is content-based may affect whether it is considered reasonable or viewpoint-neutral, under forum analysis. See, e.g., Perry, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794; Chiu, 260 F.3d 330; May 787 F.2d 1105.
¶ 23 Herbert also attempts to distinguish all the forum analysis cases from his case because those cases involve the local school district creating its own policy, whereas here the state statute regulates (via the PDC) local teachers. He cites two unpublished cases from other jurisdictions for the proposition that forum analysis is not applied where the State seeks to regulate local government property. Pocatello Educ. Ass'n v. Heideman, 2005 WL 3241745, 2005 U.S. Dist. LEXIS 34494 (D.Idaho Nov. 23, 2005), and Utah Educ. Ass'n v. Shurtleff, 2006 WL 1184946, 2006 U.S. Dist. LEXIS 27007 (D.Utah May 3, 2006). These cases are not published appellate decisions, but rather unpublished district court cases, and furthermore, they have limited (if any) applicability to the facts of this case.[2] Thus, we decline to consider Heideman and Shurtleff.
¶ 24 After considering the various constitutional tests, we conclude that forum analysis applies to this case because the restriction at issue is forum-dependent and forum analysis has been applied in factually similar cases. Although the Fifth Circuit's Garland decision is factually similar and forum analysis was not applied, the Ninth Circuit's Berry case (along with other cases from other circuits described above) applied forum analysis to a factually similar case involving public employee use of work facilities.
¶ 25 And while it is true that most of the existing case law applying forum analysis has done so where the school district itself is regulating teacher communication (as opposed to here, where a state statute regulates teacher communication), Herbert has not demonstrated that this distinction  mentioned in only two unpublished cases from other jurisdictions  has any bearing on the facts of his case, where the State's funds are being used to support the school facilities and the school districts are political subdivisions of the State. Whereas in those two cases, the states' connection to the object of regulation was tenuous or nonexistent, here State funds support public school facilities. The distinction between State property and local property is not as clear in this case as it was in the cases from other jurisdictions, and thus, we do not find them persuasive. For these reasons, we conclude that forum analysis applies here.
Forum Analysis Applied to the Statute
¶ 26 The PDC argues that its interpretation of the statute is constitutional under forum analysis. Herbert does not address whether the statute is constitutional under forum analysis because he argues that forum analysis is not the proper test to determine the constitutionality of this restriction. Because we reject Herbert's proposed test as discussed above and conclude that forum analysis is appropriate here, we now apply forum analysis to determine the constitutionality of RCW 42.17.130 as applied.
¶ 27 Forum analysis requires a two-step inquiry. First, we must determine the type of forum affected by the restriction here: Is it a public forum, a limited public *1110 forum, or a nonpublic forum? If the forum is determined to be nonpublic, the restriction is constitutional if it is reasonable in light of the purposes of the forum and is viewpoint-neutral. City of Seattle v. Mighty Movers, Inc., 152 Wash.2d 343, 350-51, 96 P.3d 979 (2004).
¶ 28 A nonpublic forum is "[p]ublic property which is not by tradition or designation a forum for public communication." Perry, 460 U.S. at 46, 103 S.Ct. 948. A school mailbox system has been held to be a nonpublic forum where there is no evidence that the system is open to the public or that access could be obtained without permission of the school. Perry, 460 U.S. at 47, 103 S.Ct. 948. See also Chiu, 260 F.3d 330; Educ. Minn. Lakeville v. Indep. Sch. Dist. 194, 341 F.Supp.2d 1070, 1075 (D.Minn.2004). Likewise, a school computer e-mail system has also been found to be a nonpublic forum where there was no evidence that the facilities were open to the public or used for public communication. Loving v. Boren, 956 F.Supp. 953, 955 (W.D.Okla.1997).
¶ 29 Here, school internal mail or computer systems are not traditionally forums for public communication, and there is no evidence in the record that Ballard High School opened either its mailbox or computer system to the public. Both systems exist to facilitate communication within the school; although the computers may be used to contact those outside the school, there is no evidence that anyone outside school had access to the computers or e-mail system. We conclude that the school's internal mail and computer systems are nonpublic forums.
¶ 30 Because these forums are nonpublic, we now must determine whether the regulation on their use is reasonable in light of their purpose and viewpoint neutral. See Mighty Movers, 152 Wash.2d at 361, 96 P.3d 979. The regulation need only be reasonable, not the most reasonable. Mighty Movers, 152 Wash.2d at 361, 96 P.3d 979. Viewpoint-neutral regulations are those not in place "merely because public officials oppose the speaker's view." Perry, 460 U.S. at 46, 103 S.Ct. 948.
¶ 31 We conclude that the PDC's interpretation of RCW 42.17.130  restricting the use of the internal school mailboxes and the e-mail system  is reasonable and viewpoint-neutral. The internal mail and computer systems exist to facilitate communication between teachers to ensure efficient sharing of information, and the restrictions on their use do not eliminate or obstruct that purpose  except to prohibit any use that would constitute political advocacy. The statute was enacted to ensure that public resources are not used to provide advantages to a particular candidate or ballot measure, and the restriction on the use of school systems furthers that purpose.
¶ 32 Also, there were permissible alternative methods of communication that would have allowed Herbert to communicate about the ballot measure petitions without violating RCW 42.17.130. For example, Herbert could have used nonwork hours to set up receptacles for petitions in break rooms or lunchrooms used only by staff. See PDC GUIDELINES FOR SCHOOL DISTRICTS IN ELECTION CAMPAIGNS, available at http://www.pdc. wa.gov/guide/interpretations/pdf/01-03A.pdf (hereinafter PDC GUIDELINES). The existence of alternatives is evidence of the reasonableness of a speech restriction. See Perry, 460 U.S. at 53, 103 S.Ct. 948 ("[T]he reasonableness of the limitations on PLEA's access to the school mail system is also supported by the substantial alternative channels that remain open for union-teacher communication to take place."). Simply because e-mail was the fastest way to disseminate a message to the Ballard High School staff does not mean that restricting Herbert's use of it is unreasonable. See Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 809, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) ("The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message.").
¶ 33 The PDC's interpretation of RCW 42.17.130 is also viewpoint-neutral because it does not favor any particular position. While Herbert argues that it is not a viewpoint-neutral restriction because it prohibits the use of public facilities for political *1111 purposes  thereby singling out political speech  restricting categories of speech (such as political speech) is in fact constitutional, but restricting only certain viewpoints (such as pro-union) within a category is impermissible. See United Black Cmty. Fund, Inc. v. City of St. Louis, 613 F.Supp. 739, 744 (E.D.Mo.1985) ("The decisions of the court make it clear that the state may exclude speakers based upon the category or type of speech involved, e.g., political versus nonpolitical, but may not discriminate against particular viewpoints expressed by speakers of a certain type."). The PDC did not interpret the statute to permit certain types of political viewpoints but not others, but did restrict the use of public facilities for any political campaign activities  regardless of the political position.
¶ 34 Thus, because the school mailbox and e-mail systems are nonpublic forums and the restrictions on their use are reasonable and viewpoint-neutral, we conclude that the PDC's interpretation of RCW 42.17.130 is constitutional.
Arbitrary and Capricious
¶ 35 Herbert argues that because there is no rational distinction between what RCW 42.17.130 permits and prohibits, the order is arbitrary and capricious. The PDC claims that there is a rational basis for making distinctions between different forums when applying restrictions on employee use of facilities, and thus, the order is not arbitrary and capricious.
¶ 36 A court may reverse an agency action if the action was "`willful and unreasoning, and taken without regard to the attending facts or circumstances.'" Children's Hosp. & Med. Ctr. v. Dep't of Health, 95 Wash.App. 858, 871, 975 P.2d 567 (1999) (quoting ITT Rayonier, Inc. v. Dalman, 122 Wash.2d 801, 809, 863 P.2d 64 (1993)). "Judging whether an agency's decision was arbitrary and capricious involves evaluating the evidence considered by the agency in making its decision." Children's, 95 Wash. App. at 871, 975 P.2d 567.
¶ 37 Herbert points to the fact that teachers could discuss a political campaign in the teacher lunchroom  which uses electricity and heating and building maintenance  but could not e-mail their colleagues about the issue to demonstrate that there is no rational distinction between what is permitted and what is prohibited by the PDC's interpretation of RCW 42.17.130. But the distinction is this: pure political speech is permitted, but using the facilities to deliver speech is prohibited. The use element provides the distinction between talking in the lunchroom and using school computers to e-mail staff members. This distinction is rational and reasonable in light of RCW 42.17.130's policy goals of ensuring that public facilities are used for their intended purposes and in maintaining the State's political neutrality. Therefore, we conclude that the application of the statute here is not arbitrary and capricious because the distinctions it draws are rationally related to the statutory restriction on the use of public facilities for political advocacy.
Overbreadth
¶ 38 Herbert argues that the statute is facially overbroad because, in its prohibition on political communication, legitimate nonpolitical communication may be squelched as well. Herbert analogizes the prohibitions in RCW 42.17.130 to an order restricting workplace displays of religious materials, as addressed in Tucker v. California Dep't of Educ., 97 F.3d 1204 (1996). Whereas in Tucker, the order prohibited all "religious advocacy" at any time in the workplace  which is essentially a prohibition on pure speech  RCW 42.17.130's restrictions target only the use of public facilities to support or oppose a political campaign. Thus, the statute itself is tailored, and WAC 390-05-271 highlights this tailoring: "[RCW 42.17.130] does not restrict the right of any individual to express his or her own personal views concerning, supporting, or opposing any candidate or ballot proposition, if such expression does not involve a use of the facilities of a public office or agency." Herbert's attempt to characterize RCW 42.17.130 as a restriction on pure speech fails.
¶ 39 Herbert points to a hypothetical example of a union newsletter that contained *1112 nonpolitical messages, but could not be delivered by a school employee to teacher mailboxes because it also contained political messages. But the goal of the statute is to prohibit public employees from using public resources to distribute political messages; the speech itself could be distributed by another means (such as the United States Postal Service). Thus, the speech itself is not chilled by the statute, but only the use of the public facilities by public employees to deliver that speech. The statute as applied carefully delineates speech that uses public facilities and all other types of speech.
¶ 40 While it is true that Herbert's hypothetical union newsletter containing both political and nonpolitical messages could not be delivered by a school employee through the internal mailbox system, nothing prohibits the union from separating the messages. A union newsletter containing nonpolitical messages could still be distributed through internal mail, while political messages could be distributed via, for example, United States mail or in a staff room during nonwork hours. See PDC GUIDELINES. Herbert's example does not demonstrate that RCW 42.17.130 as interpreted by the PDC chills nonpolitical speech because it only seeks to prohibit the use of facilities for political advocacy. Political messages may be communicated in a way that does not use public facilities, and nonpolitical messages are not regulated by RCW 42.17.130. Thus, the statute as applied is not overbroad.
Attorney Fees
¶ 41 Herbert requests attorney fees under RCW 4.84.350(1), which provides that "a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified[.]" A party is considered to have prevailed if that party obtains relief on a "significant issue." Citizens for Fair Share v. Dep't of Corrections, 117 Wash.App. 411, 436, 72 P.3d 206 (2003). But because we affirm the final order, concluding that Herbert has not prevailed on a significant issue here, he is not awarded fees.
¶ 42 For the foregoing reasons, we affirm.
WE CONCUR: BAKER and AGID, JJ.
NOTES
[1] Because the parties' appeals have been consolidated due to essentially identical facts and they filed joint briefing, this opinion refers to appellants as "Herbert" hereinafter for ease of reference.
[2] Both of the unpublished cases address restrictions on local government employees' payroll deductions for political causes. The Heideman court reviewed the restriction on political payroll deductions under strict scrutiny and found that it was unconstitutional because the prohibition was not narrowly tailored to affect only local governments, but also included private employers. In Shurtleff, the court reviewed a state prohibition on local government employee political payroll deductions, arguing that because the State did not maintain or administer local government payroll systems, it could not regulate the payroll systems as nonpublic forums. But here, although Washington schools are locally administered and some funding is provided locally, school districts are a political subdivision of the State (see RCW 28.A.315.005(2)) and the State provides some funding and building support to local school districts (see, e.g., RCW 28A.525.020). Therefore, neither of these cases are applicable to Herbert's case, where the statute at issue is narrowly tailored and the State has some involvement in maintaining public schools.