FILED
COURT OF APPEALS
DIVISION II

2015 APR -7 AM 9: 22

STATE OF WASHINGTON
BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

No. 45034-8-II

CITY OF LAKEWOOD,

    Respondent/Cross-Petitioner,

v.

ROBERT W. WILLIS,

    Petitioner/Cross-Respondent.

UNPUBLISHED OPINION

MELNICK, J. — On discretionary review, Robert Willis challenges his municipal court jury trial conviction of begging in restrictive areas. Willis argues that the City of Lakewood's (City's) anti-begging ordinance is unconstitutional because it infringes on his freedom of speech, it is unconstitutionally vague, and it discriminates against the poor. We reject Willis's freedom of speech and vagueness arguments and hold that the ordinance is a constitutional restriction on conduct in a non-public forum, and affirm the superior court. We also dismiss Willis's claim that the ordinance violates equal protection by discriminating against the poor because review was improvidently granted on this issue. We do not reach the City's cross-review claim that the superior court erred by declining to hold that the ordinance is content-neutral. Accordingly, we affirm the superior court.

## FACTS AND PROCEDURAL HISTORY

A person called 911 to report an individual banging on his or her car while begging for money on the northbound I-5 exit at Gravelly Lake Drive. A Lakewood police officer responded to the scene and found Willis standing on the shoulder of the northbound I-5 ramp, facing south

toward oncoming traffic.[1] Willis had a cardboard sign stating he was disabled and needed help. Willis approached a car by walking out from the shoulder and into the lane of travel.

The City charged Willis with begging in restrictive areas under LMC 09A.4.020A. LMC 09A.4.020A provides: "Begging shall be deemed a violation of this section of the municipal code under the following conditions: (1) at on and off ramps leading to and from state intersections from any City roadway or overpass." Begging is defined as "asking for money or goods as a charity, whether by words, bodily gestures, signs or other means." LMC 09A.4.020(E). A municipal court jury found Willis guilty of begging in restrictive areas.

Willis appealed to the Pierce County Superior Court and, for the first time, raised constitutional challenges to the ordinance.[2] The superior court affirmed his conviction and held that LMC 09A.4.020A is a reasonable time, place, and manner regulation that does not violate the First Amendment, the Due Process Clause, or the Equal Protection Clause. The superior court reasoned that the ordinance was "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Clerk's Papers (CP) at 108. The City argued that the restrictions were content-neutral; however, the superior court did not rule on the issue.

Willis and the City petitioned this court for discretionary review, which we granted. We affirm the superior court.

---

[1] The record is somewhat confusing, as it appears to indicate that the citing officer was coming southbound from the north, meaning that if Willis had been on the *northbound* ramp, the officer would have had to cross the median to reach Willis. Regardless, the uncontroverted testimony established that Willis was at an "on [or] off ramp[] leading to [or] from state intersections from any City roadway or overpass." LMC 09A.4.020A. This fact suffices for the foregoing analysis.

[2] Because Willis did not raise his constitutional issues in the municipal court, the factual record is not well developed.

## ANALYSIS

### I. STANDARD OF REVIEW

The constitutionality of a statute or ordinance is a matter of law we review de novo. *Kitsap County v. Mattress Outlet*, 153 Wn.2d 506, 509, 104 P.2d 1280 (2005). In general, a duly enacted ordinance is presumed constitutional, and the challenger must demonstrate its unconstitutionality beyond a reasonable doubt. *Mattress Outlet*, 153 Wn.2d at 509. But in the First Amendment context, the burden shifts to the State to justify a restriction on speech. *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 183, 119 S. Ct. 1923, 144 L. Ed. 2d 161 (1999). This shift also occurs where the challenged law restricts the time, place, or manner of speech. *Collier v. City of Tacoma*, 121 Wn.2d 737, 759, 854 P.2d 1046 (1993). As we explain below, LMC 09A.4.020A restricts the place of speech. Therefore, Lakewood bears the burden to meet each element of the time, place, and manner test.

### II. FIRST AMENDMENT

Willis argues that LMC 09A.4.020A violates his right to freedom of speech because it is a content-based prohibition on speech and less restrictive alternatives were available. Even if the ordinance were content-neutral, Willis argues that the City failed to demonstrate that the ordinance supported a compelling state interest or was reasonably related to supporting that interest. The City argues that LMC 09A.4.020A is a permissible regulation of speech in a non-public forum. Alternatively, the City argues that LMC 09A.4.020A is permissible as a content-neutral restriction on the time, place, or manner of speech. We agree with the City and hold that a freeway onramp is a non-public forum. We hold that LMC 09A.4.020A is a reasonable and viewpoint neutral regulation, and we affirm the superior court without reaching the City's alternative argument.

## A. Forum Analysis

"Forum analysis requires a two-step inquiry. First, we must determine the type of forum affected by the restriction here: Is it a public forum, a limited public forum, or a nonpublic forum? If the forum is determined to be nonpublic, the restriction is constitutional if it is reasonable in light of the purposes of the forum and is viewpoint-neutral." *Herbert v. Wash. State Pub. Disclosure Comm'n*, 136 Wn. App. 249, 263, 148 P.3d 1102 (2006).

The First Amendment to the federal constitution protects the right to freedom of speech.[3] But the government is not obligated to permit all forms of speech on property that it owns and controls. *Sanders v. City of Seattle*, 160 Wn.2d 198, 208, 156 P.3d 874 (2007). Therefore, "[i]n reviewing a free speech challenge to a government regulation, the level of judicial scrutiny is determined by the category into which a specific type of property falls." *Sanders*, 160 Wn.2d at 208.

The courts distinguish between three categories of forums. First, there are traditional public forums which "'have immemorially been held in trust for the use of the public and . . . for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983) (quoting *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515, 59 S. Ct. 954, 83 L. Ed. 1423 (1939)). To be a traditional public forum, a property must have "'as a principal purpose . . . the free exchange of ideas.'" *Sanders*, 160 Wn.2d at 209 (quoting *Int'l Soc'y for*

---

[3] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. CONST. amend. I.

*Krisha Consciousness, Inc. v. Lee*, 505 U.S. 672, 679, 112 S. Ct. 2701, 120 L. Ed. 2d 541 (1992) (alteration in original) (internal quotation marks omitted)).

Second, the government may create a public forum "by intentionally opening a nontraditional forum for public discourse." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 802, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985). The courts will not "infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." *Cornelius*, 473 U.S. at 803.

Third, "government property may be considered a nonpublic forum when it is not a traditional public forum and has not been designated by government as a forum for public communication." *Sanders*, 160 Wn.2d at 210.

Here, Willis was convicted of begging on a freeway onramp. To determine whether the onramp is a public forum, we consider "whether a 'principal purpose' of the property is the free exchange of ideas, whether the property shares the characteristics of a traditional public forum, and the historical use of the property." *Sanders*, 160 Wn.2d at 211. Applying this analysis we hold that a freeway onramp is a non-public forum.

Freeway onramps are not, and have never been, principally intended as a forum for the exchange of ideas. They are components of the Interstate System and are meant to "'facilitate safe and efficient travel by motorists along the System's highways.'" *Jacobsen v. Bonine*, 123 F.3d 1272, 1274 (9th Cir. 1997) (quoting *Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1203 (11th Cir. 1991)). Nothing in the record indicates that the government intended to open the freeways to public discourse. Allowing expressive activity in the freeway and its onramps would disrupt the principal purpose of the freeway which is to facilitate travel. In fact, Willis's activities disrupted travelers because he entered the lane of travel and approached cars. Freeways and their onramps

are not traditional public forums, nor have they been designated as forums for public communication. Therefore, we hold that freeway onramps are nonpublic forums.

B.      Reasonable Restriction & Viewpoint Neutral

"Speech in nonpublic forums may be restricted if ' . . . the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'" *City of Seattle v. Huff*, 111 Wn.2d 923, 926, 767 P.2d 572 (1989) (quoting *City of Seattle v. Eze*, 111 Wn.2d 22, 32, 759 P.2d 366 (1988)) (alteration in original) (internal quotation marks omitted).[4] "Viewpoint-neutral regulations are those not in place 'merely because public officials oppose the speaker's view.'" *Herbert*, 136 Wn. App. at 264 (quoting *Perry*, 460 U.S. at 46).

It is reasonable to prohibit begging activity in a forum that is primarily meant for the passage of automobiles. When persons confront motorists to ask for money, they interrupt the flow of traffic and disrupt the efficient functioning of the freeway system. Begging on the freeway also creates significant safety risks, particularly where, like Willis, a person enters into cars' lanes of travel.

LMC 09A.4.020A is also viewpoint neutral. *See Herbert*, 136 Wn. App. at 264. Under the ordinance, no one may beg on a freeway onramp, regardless of why they are begging. In other words, even though the ordinance restricts the speaking of certain content, the ordinance does not concern itself with the speaker's viewpoint. The ordinance evenhandedly regulates conduct, not to suppress any particular viewpoint, but to reduce a potentially severe threat to public safety. We

---

[4] Because Willis raised his constitutional challenges for the first time on appeal, we are mindful that the City was precluded from making a complete factual record to defend its positions. For example, it never litigated the compelling interest the City had in enacting the ordinance. Nonetheless, we feel there are sufficient facts on the forum issue for us to decide the case.

hold that LMC 09A.4.020A is a permissible regulation of a nonpublic forum, and we affirm the superior court without reaching the City's arguments on cross-review.

III.   VAGUENESS

Willis argues that LMC 09A.4.020A is unconstitutionally vague and violates the Due Process Clause of the Fourteenth Amendment. The City argues that Willis has failed to provide facts to support his vagueness claim, and that even if the record were adequate to permit review of Willis's claim, LMC 09A.4.020A is not void for vagueness. We agree with the City and affirm the superior court.

Willis appears to challenge LMC 09A.4.020A as unconstitutionally vague on its face. "'When it is alleged that a statute is wholly unconstitutional, the court looks not to the conduct of the defendant, but to the face of the statute to determine whether any conviction under the statute could be constitutionally upheld.'" *State v. Maciolek*, 101 Wn.2d 259, 262-63, 676 P.2d 996 (1984) (quoting *State v. Hood*, 24 Wn. App. 155, 158, 600 P.2d 636 (1979)).

An ordinance is sufficiently specific if two requirements are met: "First, criminality must be defined with sufficient specificity to put citizens on notice concerning conduct they must avoid. And second, legislated crimes must not be susceptible of arbitrary and discriminatory law enforcement." *City of Seattle v. Webster*, 115 Wn.2d 635, 642-43, 802 P.2d 1333 (1990); *accord Kolender v. Lawson*, 461 U.S. 352, 357-58, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983). Here, both requirements are satisfied.

LMC 09A.4.020A very clearly describes what behavior is proscribed, i.e. "asking for money or goods as a charity" while on a freeway onramp or other enumerated area. LMC 09A.4.020(E). The ordinance gives citizens and law enforcement alike precise direction about what conduct is forbidden, and where it is forbidden. Willis complains that the ordinance would

7

sweep in "all charities asking for contributions . . . people requesting donations in support of political campaigns or interest groups . . . [and] people stranded on the side of a road." Br. of Appellant at 19. Even if we accept Willis's position, it does not make the ordinance vague. Willis does not argue that LMC 09A.4.020A "invest[s] a police officer with discretion to *define* the prohibited conduct." *Roulette v. City of Seattle*, 850 F. Supp. 1442, 1446 (W.D. Wash. 1994), *aff'd*, 97 F.3d 300 (9th Cir. 1996) (emphasis added). Rather, "the ordinance itself defines what constitutes an infraction." *Roulette*, 850 F. Supp. at 1446. LMC 09A.4.020A is not unconstitutionally vague, and we reject Willis's vagueness challenge.

## IV. EQUAL PROTECTION

Willis argues that LMC 09A.4.020A discriminates against "individuals that need help or money" in violation of the Equal Protection Clause of the Fourteenth Amendment. Br. of Appellant at 21. The City argues that Willis has failed to provide facts to support his equal protection claim, and that even if the record were adequate to permit review of Willis's claim, LMC 09A.4.020A does not impermissibly discriminate against the poor. We agree that the record is not adequate to properly analyze Willis's equal protection claim, and we hold that we improvidently granted discretionary review of Willis's equal protection challenge.

As a threshold to any equal protection challenge, a party must establish that he or she is similarly situated with other persons in a class who have received different treatment under the same law. *State v. Osman*, 157 Wn.2d 474, 484, 139 P.3d 334 (2006). Willis argues that LMC 09A.4.020A discriminates on the basis of poverty. But the record does not indicate whether Willis is impoverished. It is true that the municipal court found Willis indigent. But this finding does not mean that Willis is below the poverty line—only that he "lacks sufficient funds to prosecute

an appeal." CP at 115. On this record, Willis cannot meet his burden to show that he is similarly situated with members of the allegedly targeted class.

Even if Willis could show that he was similarly situated with the impoverished, this record is not adequate to determine the merits of Willis's equal protection claim. "A defendant must establish that he received disparate treatment because of membership in a class of similarly situated individuals and that the disparate treatment was the result of intentional or purposeful discrimination." *Osman*, 157 Wn.2d at 484. Because Willis failed to raise the equal protection issue in the municipal court, the record is insufficient for us to adequately determine the City's intent or purpose for passing LMC 09A.4.020A. Willis argues that the City failed to meet its burden; however, because he never raised it in the municipal court, neither the City nor Willis had the opportunity to present all of the facts necessary to decide this issue.

Evidence of the challenged statute's disparate impact may establish the requisite discriminatory intent or purpose. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977). Absent a "clear pattern, unexplainable on grounds other than [the alleged class] . . . impact alone is not determinative." *Arlington Heights*, 429 U.S. at 266. Here, nothing in the record speaks to the impact of LMC 09.4.020A, or how it is being applied in the field. Willis's allegation that "[o]fficers are not arresting charitable organizations or firefighters in violation of this law, only poor people," is without substantiation. Br. of Appellant at 22. On this record, we are unable to perform a disparate impact inquiry.

We dismiss Willis's equal protection claim as improvidently granted, and we affirm the superior court.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

I concur:

Worswick, P.J.

BJORGEN, A.C.J. (concurring) — The majority opinion holds, correctly, that the record is not adequate to properly analyze Willis's equal protection claims. The majority opinion also concludes, however, that as a matter of law a finding of indigency does not necessarily mean that Willis is below the poverty line for equal protection purposes. Whether correct or not, a conclusion this elemental to the law's treatment of the disadvantaged should not be made on an inadequate record and without thorough briefing.

In *Douglas v. California*, the Court held, using an equal protection analysis, that those who are indigent have the right to public counsel for their first appeal as a matter of right. The evil, Justice Douglas wrote, is

> discrimination against the indigent. For there can be no equal justice where the kind of an appeal a man enjoys "depends on the amount of money he has."

372 U.S. 353, 355, 83 S. Ct. 814, 9 L. Ed. 2d 811 (1963) (quoting *Griffin v. Illinois*, 351 U.S. 12, 19, 76 S. Ct. 585, 100 L. Ed. 891 (1956)).[5] With this opinion, the Supreme Court recognized that indigency, when coupled with the restriction of a right of sufficient stature, is a classification that triggers enhanced scrutiny under the equal protection clause. The result and reasoning of *Douglas* remain vital. In 2005 the United States Supreme Court, relying principally on *Douglas*, held that the due process and equal protection clauses also require the appointment of counsel for

---

[5] The Supreme Court has recognized that due process and equal protection principles converge in the Court's analysis of this family of issues. *Bearden v. Georgia*, 461 U.S. 660, 665, 103 S. Ct. 2064, 76 L. Ed. 2d 221 (1983). The Court stated that "we generally analyze the fairness of relations between the criminal defendant and the State under the Due Process Clause, while we approach the question whether the State has invidiously denied one class of defendants a substantial benefit available to another class of defendants under the Equal Protection Clause." *Bearden*, 461 U.S. at 665.

defendants, convicted on their pleas, who seek access to first-tier review in the Court of Appeals. *Halbert v. Michigan*, 545 U.S. 605, 610, 125 S. Ct. 2582, 162 L. Ed. 2d 552 (2005).

The Supreme Court has also made clear that poverty, standing alone, is not a suspect classification. *Harris v. McRae*, 448 U.S. 297, 323, 100 S. Ct. 2671, 65 L. Ed. 2d 784 (1980). However,

> a classification based on poverty or wealth can become a suspect classification, subject to more rigid scrutiny than other classifications, when such classification interferes with a fundamental constitutional right.

16B AM. JUR. 2d *Constitutional Law*, § 904. This recognition was at work in *Douglas* and is seen, although obliquely, in the *Carolene Products* footnote that laid one of the principal doctrinal footings for enhanced scrutiny under the constitution:

> There may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten Amendments, which are deemed equally specific when held to be embraced within the Fourteenth.

*United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 n.4, 58 S. Ct. 778, 82 L. Ed. 1234 (1938).

The analysis was further refined in *Bearden v. Georgia*, 461 U.S. 660, 661, 665, 103 S. Ct. 2064, 76 L. Ed. 2d 221 (1983), which held that an indigent defendant's probation may not be revoked for failure to pay a fine and restitution, absent findings that the defendant was somehow responsible for the failure or that alternative forms of punishment were inadequate. The Court prefaced its Fourteenth Amendment analysis by stating that it has long been sensitive to the treatment of indigents in our criminal justice system and citing a list of its cases dealing with the deprivation of the rights of an indigent person to counsel, appeals, and liberty. *Bearden*, 461 U.S. at 664-65.

Our state Supreme Court has walked consistently with these precedents. In *State v. Phelan*, 100 Wn.2d 508, 514, 671 P.2d 1212 (1983), the court applied an intermediate level of scrutiny in determining that jail time must be credited against the discretionary minimum term imposed under state law in effect before adoption of the Sentencing Reform Act of 1981, chapter 9.94A RCW. Although our sentencing laws have changed, the court's rationale for imposing heightened scrutiny remains strong:

> Physical liberty, while not recognized as "fundamental", is a basic human right and the poor, while not a suspect class, cannot be said to be fully accountable for their status. Since a denial of credit for presentence jail time involves both a deprivation of liberty in addition to that which would otherwise exist, and a classification based solely on wealth, we will apply an intermediate level of scrutiny in the present case.

*Phelan*, 100 Wn.2d at 514. Thus, neither the "fundamental" status of the right nor the "suspect" nature of the class are necessary for heightened scrutiny.

When one lacks the money to eat properly, the ability to effectively ask others for help becomes critical. When one is homeless or of fluctuating mental health, it may become effectively impossible to navigate the mazes of a social service system that at times would baffle a Theseus. Depending on one's circumstances, the law's restrictions on the ability to ask individuals for help may ultimately jeopardize life, a constitutional interest among the most fundamental. This is not to argue that government may not ban aggressive panhandling on freeway ramps. It is to argue that the courts should not make rulings touching on the scope of the class of the poor for equal protection or due process purposes without a penetrating eye for

the facts of poverty in our nation and an acute review of what the case law requires in the world

as it is.

_____

Bjorgen, A.C.J.